UNITED STATES of America,
Plaintiff–Appellee,

v.

Richard Hugh NELSON,
Defendant–Appellant.

No. 87–3095.

United States Court of Appeals,
Sixth Circuit.

Argued Nov. 5, 1987.

April 29, 1988.

Harry W. Schmuck, Canton, Ohio, for defendant-appellant.

Richard G. Lillie, Asst. U.S. Atty., Cleveland, Ohio, John B. Gibbons, Asst. U.S. Atty., for plaintiff-appellee.

Before MERRITT, KRUPANSKY and RYAN, Circuit Judges.

RYAN, Circuit Judge.

Defendant Richard Hugh Nelson appeals his jury conviction under 18 U.S.C. § 2252(a)(2) for knowingly receiving through the mails material which visually depicts minors engaging in sexually explicit conduct. Nelson's appeal raises these issues: (1) whether Nelson was entrapped as a matter of law; (2) whether the district court erred in denying Nelson's motion in limine which sought to exclude pornographic books seized from his home; and (3) whether the district court's chain of custody and entrapment instructions were proper. We conclude that Nelson's assignments of error are without merit and affirm his conviction.

I.

In December 1984, federal authorities searched the Akron, Ohio home of Kenneth Larsen and the Copley, Ohio home of Larsen's mother and discovered pornographic material depicting children as well as a piece of correspondence mailed by defendant Nelson from Canton, Ohio. Kenneth Larsen subsequently pled guilty to trafficking in child pornography. In the seized letter, Nelson graphically described his anatomy and sought photos of or correspondence with "a mature bi-lady and a young one, especially if its her daughter." Based upon this letter, postal inspector Paul Hartman suspected that Nelson might be predisposed to mailing and receiving child pornography.

In February 1985, Hartman tried to establish contact with Nelson through the mails. Hartman began by sending Nelson two questionnaires from a fictional research company, "Research Facts." The first questionnaire sought responsive information from individuals interested in "youthful lads and lasses of neophyte age." Nelson did not respond to either questionnaire. In September 1985, Hartman sent Nelson two more letters. The first, a questionnaire from another fictional organization, the "Ohio Valley Action League," drew no response. The second, an offer for a free "personal ad" in the Action League's fictitious "newsletter," also went unanswered.

In October 1985, Hartman sent Nelson what purported to be a misdelivered letter from the director of the Action League. The letter purported to disclose a surreptitious source of child pornography. Nelson wrote the intended recipient (actually Hartman), enclosed a $5 bill, and requested information on how to obtain photos and videos depicting young girls. Hartman replied that Nelson should first send him a sample of materials Nelson might find interesting. Nelson did not respond.

In April 1986, Hartman mailed Nelson a letter from a fictitious Virgin Islands corporation which advertised specific adult pornographic video tapes. The letter also stated that a catalog of tapes featuring

child pornography was available upon request. Nelson responded by sending a $40 check and requesting any videotape "with very young people" as well as the child video catalog. Hartman responded by returning Nelson's check and sending Nelson the child video catalog. Nelson then sent a $60 check and ordered a tape which the advertising material had described as containing minor females engaged in various sexually explicit acts. Hartman then inscribed a unique number for identification purposes on the requested tape and had it sent to Nelson under a controlled delivery.

Approximately seventeen minutes after Nelson picked up his mail and entered his home, Hartman served a search warrant upon him. A search of Nelson's home produced the tape Nelson had ordered from Hartman as well as several paperback books which contained written portrayals of minor children engaged in sexually explicit acts.

## II.

### A

█ Nelson asserts that he was entrapped as a matter of law and, consequently, that the district court erred in denying his motion for a judgment of acquittal. The focus of an entrapment inquiry is on the defendant's predisposition to commit the offense. This court has stated:

The central inquiry in entrapment cases is whether law enforcement officials implanted a criminal design in the mind of an otherwise law-abiding citizen or whether the government merely provided an opportunity to commit a crime to one who is already predisposed to do so.

*United States v. Pennell*, 737 F.2d 521, 534 (6th Cir.1984), *cert. denied*, 469 U.S. 1158, 105 S.Ct. 906, 83 L.Ed.2d 921 (1985). When a defendant raises the entrapment defense, the government bears the burden of proving predisposition beyond a reasonable doubt. *Id.* (citing *United States v. Jones*, 575 F.2d 81, 83 (6th Cir.1978)).

Entrapment is usually a question of fact for the jury. However, a defendant who shows undisputed facts and testimony demonstrating a "patently clear" absence of predisposition can make a claim of entrapment as a matter of law. *Pennell*, 737 F.2d at 534–35 (citing *United States v. Henciar*, 568 F.2d 489, 491 (6th Cir.1977), *cert. denied*, 435 U.S. 953, 98 S.Ct. 1582, 55 L.Ed.2d 803 (1978)). But if there is any showing of predisposition, it is up to the jury to determine whether the government agents actually implanted the criminal design in the mind of the defendant. *Henciar*, 568 F.2d at 491–92.

Nelson did not respond to Hartman's first four letters. Only after the "misdelivered" fifth letter did he express any pedophilic interest. He argues that his resistance indicates a lack of predisposition. As additional support, Nelson cites his refusal to send the samples which Hartman's sixth letter sought. While the issue is close, we conclude that Nelson has not demonstrated the "patently clear" absence of predisposition necessary to show entrapment as a matter of law.

At the very outset, Nelson's letter seized in the December 1984, Larsen search evinces a predisposition to violate § 2252:

I am 6′ 2″ tall [*sic*] trim and hung 9″ and thick [*sic*] also single. I have read your ad, and it sounds very interesting, as there's nothing nicer than a mature bi-lady and a young one, especially if it's her daughter.... I would like to buy some photos and correspond if possible, maybe meet.

Concededly, Hartman's first four letters soliciting responses from Nelson went unanswered. Although Nelson refused to *send* the samples requested by Hartman's sixth letter (a separate violation under § 2252(a)(1)), he quickly responded to Hartman's seventh and eighth letters which offered to sell Nelson the material in question through the mails (a violation under § 2252(a)(2)).

Finally, the contents of the paperback books seized from Nelson's home are indicative of a predisposition to purchase pedophilic materials. We conclude that the foregoing evidence of Nelson's predisposition, taken together, sufficiently raises a

question of fact for the jury under *Henciar*, 568 F.2d at 491–92, and that the district court properly denied Nelson's motion for judgment of acquittal.

### B

■ Nelson sought to exclude from evidence eight paperback books seized from his home in the same search that produced the tape Hartman had previously mailed. Nelson based his argument on the rationale of *Stanley v. Georgia*, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969), which created a constitutionally protected right to possess obscene materials in one's home. The district court denied the motion.

In *United States v. Orito*, 413 U.S. 139, 93 S.Ct. 2674, 37 L.Ed.2d 513 (1973), the court rejected the contention that *Stanley* established a correlative right to receive, transport, or distribute obscene material. Relying on this holding, other circuits have held that punishing the mere receipt of child pornography under § 2252 is constitutional. See *United States v. Marchant*, 803 F.2d 174 (5th Cir.1986); *United States v. Hale*, 784 F.2d 1465 (9th Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 110, 93 L.Ed.2d 59 (1986).

Nelson was convicted of receiving child pornography. By raising the entrapment defense, he therefore raised the issue of predisposition. The seized paperbacks are relevant as to whether or not Nelson was predisposed to send for pedophilic materials and on that basis alone were properly admitted. The parameters of *Stanley* are simply inapposite to this case, for Nelson was never criminally charged for *possessing* the books.[1]

### C

Nelson argues that the court's instructions inadequately reflected the conflicting testimony surrounding the authenticity of the seized videotape. Nelson testified that the tape introduced into evidence was not the one seized by Hartman. Hartman testified that he affixed an identifying label on the tape prior to delivering it to Nelson and that he had maintained complete control over that same tape since its seizure. The jury was generally instructed that it was to weigh the evidence and that it could "accept or reject the testimony of any witness in whole or in part."

■ Nelson has failed to cite to any portion of the record which indicates that he either filed a written request for a contrary instruction or that he objected to the given instruction. His failure to do so bars assignment of error on appeal. Fed.R. Crim.P. 30. Even had Nelson made a timely objection, his argument is without merit. In closing argument, Nelson's attorney raised the possibility that Hartman was deceitful and that the tape was not authentic. Under the general instruction previously cited, the jury could have permissibly accepted or rejected Nelson's interpretation of the evidence.

■ Nelson also argues that the instructions inadequately defined the defense of entrapment. The instruction given by the district court is nearly identical to the standard entrapment instruction cited by the Supreme Court in *United States v. Russell*, 411 U.S. 423, 427 n. 4, 93 S.Ct. 1637, 1640 n. 4, 36 L.Ed.2d 366 (1973). We find that the court's entrapment instruction, when read in conjunction with the previously cited general instruction, adequately addresses the relevant indicia of predisposition.[2] This court has long held that a trial judge is not required to give a requested instruction if the subject matter of the instruction is substantially covered in the judge's general charge. *United States v. Carabbia*, 381 F.2d 133, 138 (1967), *cert. denied*, 389 U.S. 1007, 88 S.Ct. 564, 19 L.Ed.2d 602 (1967).

---

**1.** We note, however, that Ohio's attempts to criminalize the mere possession of materials containing sexual depictions of minors, Ohio Rev. Code Ann. (Anderson 1987) §§ 2907.-321(A)(5) and 2907.322(A)(5), have been held constitutional. See *State v. Meadows*, 28 Ohio St.3d 43, 503 N.E.2d 697 (1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 1581, 94 L.Ed.2d 771 (1987).

**2.** See, e.g., *United States v. Thoma*, 726 F.2d 1191, 1197 (7th Cir.1984), *cert. denied*, 467 U.S. 1228, 104 S.Ct. 2683, 81 L.Ed.2d 878 (1984).

Nelson also argues that the entrapment instruction is insufficient because it does not contain his proposed charge that would have instructed the jury to find that Hartman had violated 18 U.S.C. § 1461 because he, not Nelson, deposited non-mailable material in the mail. This instruction ignores the investigatory powers of the postal inspector and is not relevant to Nelson's own receipt of the tape which is itself a violation of § 2252.

For the foregoing reasons, the defendant's conviction is AFFIRMED.

MERRITT, Circuit Judge, dissenting.

The federal officers who conducted the search in question violated Nelson's First and Fourth Amendment rights when they seized from defendant's home eight nonpictorial paperback books of fiction containing narrative descriptions, but no photographs, of minors engaged in sexually explicit conduct. Not only were these books not "particularly described" in the search warrant with "scrupulous exactitude," as required by law; they were not described at all.

The central thrust of defendant's argument is that during the search, officers seized evidence not described in the warrant which Nelson had a right to possess. Appellant's Br.16; App.9; Trial Transcript, 106. The District Judge denied defendant's Motion in Limine on this issue at trial. Tr. 105–116. As a result of the ruling, the government elicited testimony describing these eight books from two witnesses during its case in chief. The government extensively cross-examined Nelson concerning specific passages from the books, and during closing argument told the jury that it should read the books during deliberations. Tr. 330.

In this case, the search warrant described the items the officers were authorized to seize. The warrant categorizes eleven types of seizable materials, all of which must involve films or "photographic depictions of minors engaged in sexually explicit conduct, as defined in Title 18, Section 2255, United States Code." In executing this warrant, the officers searched through "the basement, the downstairs, kitchen, dining room, dining area, living room closet, both bedrooms, bathroom, the whole townhouse apartment." Tr. 197. The officers found the nonpictorial paperback books in the bottom drawer of a chest.

It is undisputed that the books seized did not contain any photographs of children engaged in sexual activity, as specified by the warrant. Tr. 106–116, 195, 278–282; Appellee's Br. at 16–17; Appellant's Br. 16. No language in the warrant authorized the seizure of nonpictorial materials. The officers' seizure of the books was wholly outside the scope of the warrant. Thus it is obvious that seizure of these books violated defendant's Fourth Amendment rights.

The majority explained that these books were properly admitted into evidence because "they are relevant as to whether or not Nelson was predisposed to send for pedophilic materials." Maj. Opin. at 288. But just because the books are similar in content to the illegal videotape does not justify their seizure. The warrant did not state with specified particularity—in fact, did not state at all—that the officers were authorized to seize these presumptively protected materials. Therefore, seizure and later admission into evidence of these books violated Nelson's First and Fourth Amendment rights.

These books are protected by the First Amendment because the defendant has a right to possess them in the privacy of his home even if they are obscene. *Stanley v. Georgia*, 394 U.S. 557, 568, 89 S.Ct. 1243, 1249, 22 L.Ed.2d 542 (1969) ("We hold that the First and Fourteenth Amendments prohibit making mere private possession of obscene material a crime."). The mere private possession of these books is not illegal, a point conceded by the government at trial. Tr. 113. They cannot be made illegal under *Stanley*. The Child Protection Act, under which Nelson was indicted, proscribes "any *visual* depiction" involving the use of a minor engaged in sexually explicit conduct. 18 U.S.C. § 2252(a)(2)(1984) (emphasis supplied). The legislative history indicates that the primary purpose for the Act was to minimize the exploi-

tation of children who pose in sexually explicit photographs and films. *See* H.Rep. 536, 98th Cong., 2d Sess. 1, *reprinted in* 1984 U.S. Code Cong. & Admin. News 492. The eight books found in Nelson's home however did not involve the use of children in their production. They are fictional representations of ideas and thoughts, not dissimilar in that respect from Nabokov's *Lolita* and Salinger's *Catcher in the Rye.*

The Supreme Court has "long recognized that the seizure of films or books on the basis of their content implicates First Amendment concerns not raised by other kinds of seizures." *New York v. P.J. Video, Inc.,* 475 U.S. 868, 873, 106 S.Ct. 1610, 1614, 89 L.Ed.2d 871 (1986). In *A Quantity of Books v. Kansas,* 378 U.S. 205, 211–12, 84 S.Ct. 1723, 1726, 12 L.Ed.2d 809 (1964), the Court explained that the "standards governing searches and seizures of allegedly obscene books ... differ from those applied with respect to narcotics, gambling paraphernalia and other contraband." *See also Lo–Ji Sales, Inc. v. New York,* 442 U.S. 319, 326 n. 5, 99 S.Ct. 2319, 2324 n. 5, 60 L.Ed.2d 920 (1979). The Court has concluded that when officers want to seize materials presumptively protected by the Constitution, the search warrant must state with a high degree of particularity exactly what items are to be seized.[1] *See Stanford v. Texas,* 379 U.S. 476, 485, 85 S.Ct. 506, 511, 13 L.Ed.2d 431 (1965). *See also Maryland v. Macon,* 472 U.S. 463, 468, 105 S.Ct. 2778, 2781–82, 86 L.Ed.2d 370 (1985); *Zurcher v. Stanford Daily,* 436 U.S. 547, 565, 98 S.Ct. 1970, 1981, 56 L.Ed.2d 525 (1978); *Nixon v. Administrator of General Services,* 433 U.S. 425, 530–31, 97 S.Ct. 2777, 2834, 53 L.Ed.2d 867 (1976) (Burger, J., dissenting). *See generally* R. Rotunda, J. Nowak & J. Young, *Treatise on Constitutional Law* 2d Ed. 1060 n. 10 (1988). *Cf. Roaden v. Kentucky,* 413 U.S. 496, 93 S.Ct. 2796, 37 L.Ed. 2d 757, (1973); *Heller v. New York,* 413 U.S. 483, 93 S.Ct. 2789, 37 L.Ed.2d 745

(1973); *Lee Art Theatre, Inc. v. Virginia,* 392 U.S. 636, 88 S.Ct. 2103, 20 L.Ed.2d 1313 (1968); *A Quantity of Books v. Kansas,* 378 U.S. 205, 84 S.Ct. 1723, 12 L.Ed.2d 809 (1964); *Marcus v. Search Warrant,* 367 U.S. 717, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961).

In *Stanford,* the Court held that a warrant authorizing seizure of materials related to the Communist Party of Texas was an illegal general search when officers seized from Stanford's house over 2,000 books and materials written by such authors as Karl Marx, Jean Paul Sartre, and Justice Hugo L. Black. 379 U.S. at 479, 85 S.Ct. at 508. None of the materials related to records, lists or payments involving the Communist Party. *Id.* at 480, 85 S.Ct. at 509. The Court explained:

> The constitutional requirement that warrants must particularly describe the things to be seized is to be *accorded the most scrupulous exactitude when the "things" are books, and the basis for their seizure is the ideas which they contain.*

*Id.* at 485, 85 S.Ct. at 511–12 (footnote and citations omitted, emphasis supplied).

Several Supreme Court cases involving search warrants for possibly protected material have invoked *Stanford's* requirement that judges must apply scrupulous exactitude when they describe what items are seizable. *See, e.g., Zurcher,* 436 U.S. at 565, 98 S.Ct. at 1981. Recently, in *Maryland v. Macon,* 472 U.S. 463, 105 S.Ct. 2778, 86 L.Ed.2d 370 (1985), involving the sale of allegedly obscene magazines, the Court stated:

> The First Amendment imposes special constraints on searches for and seizures of presumptively protected material ... and requires that the Fourth Amendment be applied with a "scrupulous exactitude" in such circumstances.

*Id.* at 468, 105 S.Ct. at 2781.

Our Court recognized in *Sovereign News Co. v. United States,* 690 F.2d 569 (6th

---

**1.** Although in *P.J. Video,* 475 U.S. 868, 106 S.Ct. 1610, the Supreme Court ruled that the Fourth Amendment does not require a higher standard of probable cause for warrants authorizing the search for constitutionally protected materials, it left intact *Stanford's* requirement of a heightened degree of particularity in search warrants.

Cir.1982), that in searches for obscene material, "the items to be seized must be described with 'scrupulous exactitude.'" *Id.* at 576 (citing *Stanford,* 379 U.S. at 485, 85 S.Ct. at 511). Numerous other circuits have similarly viewed the high degree of particularity required in search warrants for presumptively protected materials. *See United States v. Coppage,* 635 F.2d 683, 687 n. 2 (8th Cir.1980) ("where a search may touch areas involving first amendment concerns, greater particularity should be required."); *United States v. Cook,* 657 F.2d 730, 733 n. 2 (5th Cir.1981) ("additional degree of scrutiny afforded the particularity requirement of a warrant to search for and seize books, films and other communications media"); *United States v. Torch,* 609 F.2d 1088, 1089 (4th Cir.1979) ("particularity requirement is even more stringent where the things to be seized have the presumptive protection of the First Amendment"); *United States v. Scharfman,* 448 F.2d 1352, 1354 (2d Cir.1971) ("particularity requirement to be accorded most scrupulous exactitude when the things are books ... [b]ut when first amendment rights are not involved, the specificity requirement is more flexible.").

In this case, the warrant does not indicate in any way that the officers could seize nonpictorial books. No description at all hardly comports with *Stanford*'s requirement that seizable items be particularly described with "scrupulous exactitude." The warrant thus does not comply with the high degree of particularity required for seizure of presumptively protected materials. Thus these books were impermissibly seized and the District Court should not have allowed them into evidence. The Court has simply amended the Fourth Amendment by striking the particularity clause out of it.[2]

---

**2.** The Fourth Amendment provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, *and particularly describing the place to be searched, and the persons or things to be seized.*

U.S. Const. Amend. IV (emphasis supplied).